IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED

06 JUN -9 PM 4: 23

STEPHANIE GONZALES, as Personal Representative
of the Estate of Mary Alice Valencia, deceased, and
STEPHANIE GONZALES, ABIE PADILLA, and
GERALD PADILLA, individually and as the surviving
children of MARY ALICE VALENCIA,

Plaintiffs,

vs.                                                    No. CIV 05-941 BB/LFG

THE GOODYEAR TIRE AND RUBBER COMPANY,
an Ohio corporation; CA GOODYEAR DE VENEZUELA,
VALENCIA, a foreign corporation; JOHN DOES I-X and
JANE DOES I-X; ABC CORPORATIONS I-X and XYZ
PARTNERSHIPS I-X; DRIVETIME CAR SALES, INC.
d/b/a Ugly Ducking Car Sales; JOHN DOE, as the Personal
Representative of the Estate of ADOLPHO MICHAEL VALENCIA,
and FOUNDATION RESERVE INSURANCE COMPANY, INC.,

Defendants,

and

ALICIA MARIE HOLGUIN, as Personal Representative
of the Estate of ADOLFO MICHAEL VALENCIA; and
ALICIA MARIE HOLGUIN, MICHAEL VALENCIA,
CRYSTAL ARMAS and STEPHANIE R. VALENCIA,
the surviving children of ADOLFO MICHAEL VALENCIA,

Plaintiff Intervenors,

vs.

THE GOODYEAR TIRE AND RUBBER COMPANY,
an Ohio corporation; CA GOODYEAR DE VENEZUELA,
VALENCIA, a foreign corporation; JOHN DOES I-X and
JANE DOES I-X; ABC CORPORATIONS I-X and XYZ
PARTNERSHIPS I-X; DRIVETIME CAR SALES, INC.
d/b/a Ugly Ducking Car Sales.

Defendants.

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER
OF DEFENDANT THE GOODYEAR TIRE & RUBBER COMPANY
CONCERNING AMENDED NOTICE TO TAKE 30(b)(6) DEPOSITION**

Defendant, The Goodyear Tire & Rubber Company ("Goodyear") respectfully submits this Memorandum Brief in Support of Motion for Protective Order of Defendant The Goodyear Tire & Rubber Company Concerning Amended Notice to Take 30(b)(6) Deposition ("Motion"). As set forth more fully below, the Court should sustain the objections attached as Exhibit B to the Motion and should enter a protective order in connection with Plaintiffs' Amended Notice to Take 30(b)(6) Deposition, served May 16, 2006 ("Notice"), which is attached as Exhibit A to the Motion.

## I.   <u>INTRODUCTION</u>

This case involves the alleged tread/belt separation of a Goodyear Radial ATR Pathfinder LT215/75R15 Load Range C tire manufactured at the Valencia, Venezuela, plant of C.A. Goodyear de Venezuela ("subject tire"). Plaintiffs have alleged various theories of recovery with respect to the subject tire, including that it purportedly had a design defect (although Plaintiffs have been unwilling to tell Goodyear in discovery what they think was wrong with the design), that there was a manufacturing defect (although Plaintiffs have refused to explain what they think was defective about the manufacture of the tire and how it could have caused the accident at issue), and that there was a warnings defect (although, again, Plaintiffs refuse to explain what warning should have been given that was not given).

Plaintiffs have served Goodyear with an Amended Notice to Take 30(b)(6) Deposition, that contains thirty-six (36) separate topics on which Plaintiffs expect Goodyear to provide testimony. <u>See</u> Exhibit A to Motion. Based on their Notice, one readily could conclude that Plaintiffs are not much interested in discovery about the subject tire. Indeed, arguably only two out of their thirty-six topics are limited to the Pathfinder LT215/75R15. <u>See</u> Topics "dd" and "ee". The remaining topics all propose to stretch the scope of inquiry well beyond permissible

discovery standards, far afield from the subject tire. By means of their Notice, Plaintiffs want information about hundreds, if not thousands, of *different* tires. See Affidavit of James Stroble ("Stroble Affidavit") attached as Exhibit C to Motion at ¶¶ 25. Tires, however, simply cannot be compared to one another in a manner that would imbue with Rule 26 relevancy the topics contained in Plaintiffs' Notice. Goodyear fully intends to produce witnesses to testify, to the extent possible, with respect to these topics insofar as they pertain to the subject tire, but Goodyear should not be required to prepare witnesses to discuss hundreds or thousands of different tires, simply because Plaintiffs have conjured overbroad topics for their Notice.

When questioned about a draft of their 30(b)(6) notice that contained thirty-two (32) topics (later expanded to 36 topics), Plaintiffs' counsel revealed that in fact not even Plaintiffs view this deposition as one intended to obtain relevant information:

> Given that this is our first tire case, we need to gather as much information about tire design and manufacturing as we can to understand what is relevant and what the important issues for the jury will be. **In other words, we need to understand the lay of the land before we can even begin the relevant discovery.**

See Exhibit A, hereto (5/11/06 letter from Jaramillo to DeCandia) (emphasis added). Goodyear submits that its corporate representative deposition should not be a mere *predicate* to relevant discovery that might come later.

Consistent with Plaintiffs' "lay of the land" approach, a substantial number of Plaintiffs' topics pertain to tire service life information. Plaintiffs have no threshold basis for seeking such information in this case, which involves a tire that was less than five years old at the time of the accident. This unsupported theory has no application to the case the parties are litigating here. Therefore, Goodyear requests that the Court sustain its objections to producing witnesses with respect to these topics.

Finally, some of Plaintiffs' topics could be understood as being broad enough to seek trade secret information about Goodyear's rubber compound formulas protected from discovery by the trade secret privilege. Such information is never disclosed outside of Goodyear, and, within Goodyear, is provided only to those who have a need for the information. To the extent, therefore, that Plaintiffs seek such trade secret information, Goodyear requests that the Court enter a protective order in order to preserve inviolate the trade secret nature of Goodyear's rubber compounds.

Goodyear has prepared a Notice of Partial Non-Appearance for the deposition and attached to it formal objections with respect to the topics contained in Plaintiffs' Notice. The Notice of Partial Non-Appearance together with the objections are attached as Exhibit B to the Motion. Goodyear asks the Court to sustain its objections through a protective order.

## II.    ARGUMENT

This Court has broad discretion in the management of discovery in a civil suit. The power to enter protective orders is provided by Fed. R. Civ. P. 26(c). Protective orders provide a safeguard for parties and other persons against inappropriate discovery. United States v. CBS, Inc., 666 F.2d 364, 368-369 (9th Cir.), cert. denied, 457 U.S. 1118 (1982). The court has the power to limit discovery if the burden or expense of the proposed discovery outweighs its likely benefit, and may, upon motion by a person from whom discovery is sought, and for good cause shown, "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, undue burden or expense." Fed. R. Civ. P. 26(b)(2)(iii); Fed. R. Civ. P. 26(c). To this end, a court may order "that discovery may be had only on specified terms and conditions . . ." and "that certain matters not be inquired into, or that the scope of disclosure or discovery be limited to certain matters." Fed. R. Civ. P. 26(c)(2); Fed. R. Civ. P. 26(c)(4).

Importantly, the "'desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant.'" Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995) (quoting Scales v. J.C. Bradford & Co., 925 F.2d 901, 906 (6th Cir. 1991)).

The patent overbreadth of Plaintiffs' Notice in this case warrants the application of the Court's power to enter a protective order. While Plaintiffs are entitled to information pertaining to the subject tire, Goodyear should not be put to the vast expense of providing irrelevant testimony on the hundreds and hundreds of other dissimilar tires as to which Plaintiffs seek discovery. Goodyear fully expects to provide witnesses and testimony at the 30(b)(6) deposition and is not asking the Court to disallow the deposition. But the Court should sustain Goodyear's objections with respect to irrelevant information about other tires made at other times and at other facilities.[1] Further, the Court should act to protect Goodyear's trade secret information concerning its rubber compound formulas.

A.  **Plaintiffs' Efforts to Expand The Scope of Discovery Beyond the Subject Tire Must be Rejected**

1.  **Plaintiffs' Deposition Notice Seeks Information Concerning Hundreds, if not Thousands, of Different Tires and is Unlimited in Timeframe and Place of Manufacture**

The topics identified by Plaintiffs in their Notice encompass hundreds and possibly thousands of different models of tires, including tires of different sizes, different load ranges, different speed ratings, different types, different weights, and different intended uses, none of which is substantially similar to the tire at issue in this case. See Stroble Affidavit, ¶ 25. For

---

[1] In the context of written discovery, Goodyear has offered to expand the scope of discovery to common green tires with the same tread pattern as the subject tire, but Plaintiffs have never responded to that offer. See Exhibit B, hereto. Plaintiffs have now, however, filed a motion to compel (see Docs. 99, 100) in which they apparently reject that offer, claiming instead that they are entitled to massive amounts of information on subjects that are similarly, if not more egregiously, overbroad than the Notice at issue here. Goodyear will respond to that motion in due course.

5

example, some of Plaintiffs' requests apparently seek information regarding all tires made from the same skim stock. See , e.g., topics "b", "d", and "e". Such a request could span a wide spectrum of tires Goodyear produces, and there is simply no credible basis for seeking such information, as explained more fully below. See Stroble Affidavit at ¶24. Similarly, Plaintiffs' topics that call for information pertaining to all light truck tires or all load range C, D and E tires would involve, as of February, 2005, 23 different lines of tires, 293 different product codes and 469 different specifications, just for Goodyear brand tires produced in North America. If Kelly Springfield and custom brands were included, the information would involve more than 1,500 specifications different from the tire at issue here. See Stroble Affidavit, ¶ 25.

Moreover, almost none of Plaintiffs' topics has any limitation on the timeframe or manufacturing facility for which information is requested. Such deficiencies further compound the overbreadth of information to which Plaintiffs seek access and cannot be substantiated under any rational theory of products liability discovery. See Stroble Affidavit at ¶ 31. In order to analyze the true scope of what Plaintiffs are seeking, the Court may find it helpful to consider information concerning how tires are made and the differences that exist among them.

### 2.   A Tire's Components

A steel radial belted tire is a complex highly engineered composite structure consisting of six major components, among others. Each of these primary components is engineered to serve specific functions in the tire. The first is the inner liner, which is a unique rubber compound that acts as the tire's inner tube and retains the air in the tire. The second component is the tire beads consisting of steel wires and a unique rubber compound coating that secure the tire to the rim once the tire has been inflated, preventing the tire from slipping on the wheel and preventing air loss between the tire and rim. The third component is the body plies, which consist of fabric

cords (in most passenger tires) that are coated with rubber of a unique formula, and give the tire the strength and structure necessary to retain the air pressure to carry the specified loads. The fourth component is the steel belts, which are a composite of steel cords and a rubber compound that provide additional strength and stability in the tread area. The fifth component is the tread, which consists of specially formulated rubber compounds and a specially designed tread geometry, which together provide wet and dry traction, tread wear, rolling resistance, and ride and handling characteristics. Tread geometry, including rib, lug and groove location, depth, size, shape, density and proximity to one another can alter the location and degree of forces/stresses on the tire carcass and change its use and ride characteristics. The sixth component is the rubber sidewalls, which protect the internal structure against minor cuts and abrasions and provide aesthetic appearance to the tire. Stroble Affidavit, ¶ 7.

To build a tire, the various components are carefully assembled on a tire building machine. The uncured or "green" tire is placed in a mold where specified heat and pressure are applied to "cure" the tire. During this curing process, chemical and physical changes take place so that the physical dimensions, properties and chemical composition of a finished tire are different from that of "green," or uncured, tire. Stroble Affidavit, ¶ 9.

### 3.    Tires Are Designed for Specific Characteristics

Each size and type of tire, depending on its construction, has its own load-carrying characteristics and capacity, along with drive and performance characteristics.  While, for example, there may be a number of 15-inch tires on the market, it does not mean that each one can carry the same load or operate in the same manner under similar circumstances with different vehicles.  Some tires are too narrow to operate safely on some vehicles, or may have an inappropriate tread pattern for certain uses. Tire construction for light usage will not work for

heavier loads. Cornering ability in one tire may be detrimental on the wrong vehicle. This depends uniquely upon the construction of the sidewall and other materials in the tire.

The uniqueness of different tires is well documented in the technical literature. Modern tires are the culmination of years of scientific and engineering work resulting in highly sophisticated and unique products individually tailored for use on particular vehicles for particular purposes. F. J. Kovac & M. B. Rodgers, *TIRE ENGINEERING,* in SCIENCE AND TECHNOLOGY OF RUBBER 675, 676 (James E. Mark et al. eds., 1994).

Because all tires are not similar, they cannot effectively be compared by any one, or even a small group of components. Stroble Affidavit, ¶ 11. A "similar tire" is one that is built and cured to the same specifications, which not only is composed of the same compounds and reinforcements, but is cured to have the same mold shape and tread pattern geometry. Stroble Affidavit, ¶ 12. Identical green tires cured in different molds to yield different tread geometry will have substantially different performance characteristics. These differences will be apparent in footprint shape, dry and wet traction, tread wear, noise, cut resistance and other characteristics. Stroble Affidavit, ¶ 13. The tread geometry is characterized by overall contact area, depth, shape, size and proximity of ribs, grooves, individual elements and blading within an element. This geometry acts to transmit stresses and forces from the road through the casing to the vehicle and back to the road. This transmission of forces produces the ride and handling characteristics of the tire and ultimately, its overall performance. Stroble Affidavit, ¶ 14.

The similarity between tires cannot be correctly shown by selecting and comparing single compounds or components or even groupings of components. Compounds and reinforcements such as wire coat stock (sometimes referred to by others as "skim stock") and belt wire constructions may be used across vastly differing types of tires. Stroble Affidavit, ¶ 15. Only

8

tires made from the same green tire specification with the same tread design have the same size, load carrying capacity, belt size, and components as the tire at issue. Any other tire made by Goodyear would differ in some aspect that could or would have a significant impact on how the tire was constructed or operates. Stroble Affidavit, ¶16.

Most other tires sold by Goodyear are significantly different from the subject tire, a Pathfinder LT215/75R15 in one or more respects: many other tires have a different aspect ratio: many have higher or lower load ratings and inflation pressures; the tread patterns and weights are different; rubber compounds vary from one tire to the next; and many of the other tires are used for different applications from those the Pathfinder LT215/75R15 is suited for. Stroble Affidavit, ¶ 17. Any attempt to group various sizes and models of tires as "substantially similar" ignores the crucial differences among the different size and type of tires. Goodyear manufactures a wide variety of tires containing an equally wide variety of specifications, which are unique to each specific model and size of tire. For example, in 2004 Goodyear produced over 200 million tires. Of those 200 million plus tires, there were approximately 70 different passenger and light truck tire lines produced in Goodyear North American plants and marketed under the Goodyear name alone. For each tire line, there may be from 1 to 30 or more different specification codes for various sizes, load ratings, sidewall styles and customers. And, often these codes will also have multiple specifications to allow production in more than one manufacturing facility. For example, as of February 2005, there were over 1500 different "active" specifications authorized to produce just the Goodyear brand passenger and light truck tires in North America. This figure does not include past specification revisions for just the current authorized tires, which would number in the tens-of-thousands, or more. Stroble Affidavit, ¶ 18.

9

Goodyear radial passenger and light truck tires are made in many sizes to fit from 13 inch to 24 inch wheel diameters, and to fit a wide range of vehicles from small to large cars, small to large pick up trucks, sport utility vehicles, vans, campers and trailers. Stroble Affidavit, ¶ 19. In addition to overall size differences among the broad range of passenger and light truck tires designed and manufactured by Goodyear, the type and size of many individual components vary significantly, including different thickness of centerline, tread and shoulder tread areas, tread widths, different top and bottom belt widths, belt gauges, tread compounds, other rubber formulas and many other items. Stroble Affidavit, ¶ 20.

Different molds are used to cure other light truck, passenger and medium truck tires which differ from the specification utilized in the subject tire. As a result, all passenger tires, medium truck tires and all other light truck tires produced from different specifications would differ from the subject tire in parameters such as section height, section width, molded base width, tread pattern, tread geometry and tread radius. In addition, different rubber compounds - with different formulations, different ingredients, and different performance characteristics – are used for various components. These includes compounds for tire liners, ply coats, belt coats, tread caps, tread bases and sidewalls. Likewise, the width and gauge, or thickness, of many of these tire components used in the subject tire are different from those used in passenger tires and other different light truck tires. Therefore, information relating to tires other than the subject tire would not be truly comparable and could be misleading. Stroble Affidavit, ¶ 21.

Light truck tires, tires of different load ranges, and other passenger tires are not what the tire industry would consider "similar tires." Tires manufactured with designs different from the subject tire differ in one or more aspects that could or would affect tire use and performance. Stroble Affidavit, ¶ 22. For this reason, requesting information on other tires that share the same

skim stock and/or share the same common green tire but are cured in a different mold is not a true link for the purpose of performance comparison. Stroble Affidavit, ¶ 23.

### 4. Tire Failures Are Rare, and Courts Recognize That Failures Primarily Result from Misuse

Tire failures in service are rare, and generally result from abuse. Stephen Bobo, *Tire Flaws and Separations,* in MECHANICS OF PNEUMATIC TIRES 636 (Samuel K. Clark ed. 2d ed. 1981). It is widely recognized within the tire industry that tread/belt separations can occur from a wide variety of service conditions such as overdeflection (underinflation and/or overloading), punctures, improper repairs, impact damage, road hazards, mounting damage, high speed operation, improper tire rotation, wear into the belt structure, misalignment, vehicle conditions, improper storage and other types of service damage or abuse. "Introduction to Tire Safety Durability and Failure Analysis," J.D. Gardner and B.J. Queiser, Chapter 15 of The Pneumatic Tire, Department of Transportation (Washington, D.C. 2005) and "Tire Examination After Motor Vehicle Collisions," Calvin P. McClain, Jr. and Michael A. DiTallo, Chapter 8 of Traffic Collision Investigation, Northwestern University Center for Public Safety (2001). See also Kuhmo Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167 (1999); Pherson v. Goodyear Tire & Rubber Co., 590 F.2d 756 (9th Cir. 1978); Rubber Manufacturer's Association, CARE AND SERVICE OF AUTOMOBILE AND LIGHT TRUCK TIRES (1995).

Courts universally recognize that tires fail from numerous causes having nothing to do with defect. Shramek v. General Motors Corp., 216 N.E.2d 244 (1966); Williams v. U. S. Royal Tires, 101 So.2d 488 (La. App. 1958); Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc., 395 So.2d 991 (Ala. 1981); Woelfel v. Murphy Ford Co., 487 A.2d 23 (Pa. Super. 1985).[2] It is

---

[2] The Court in Shramek for instance held for the manufacturer as a matter of law by concluding that:
> *The mere fact of a tire blowout does not demonstrate the manufacturer's negligence, nor tend to establish that the tire was defective. Blowouts can be attributed to myriad causes, including not*

common knowledge that use of a tire on a vehicle exposes it to possible injury and abuse. Wojciuk v. United States Rubber Co., 120 N.W.2d 47, 52 (Wis. 1963).   Where misuse causes of a tire failure are present, judgment is regularly granted for the tire manufacturer.   See, e.g., Springer Corp. v. Dallas & Mavis Forwarding Co., Inc., 90 N.M. 58, 60, 559 P.2d 846, 848 (Ct. App. 1976) (in product liability action against a tire manufacturer where the subject tire had a puncture and evidence of underinflation, court of appeals reversed a jury verdict for plaintiff, holding there was insufficient evidence that the tire failure resulted from a defect as opposed to the puncture in the tire), cert. denied, 90 N.M. 254, 561 P.2d 1347 (1977).[3]

### 5.   This Court Should Sustain Goodyear's Objections as to Relevancy and Scope of Permissible Discovery

In order for Plaintiffs to be entitled to discovery on *other* tires – makes, sizes and models not involved in this lawsuit – Plaintiffs must, at a minimum, first establish that the other tires are substantially similar to the Pathfinder LT215/75R15.[4]   See, e.g., Piacenti v. General Motors Corp., 173 F.R.D. 221, 225 (N.D.Ill. 1997)("allowing discovery of models that are not

---

*only the care with which the tires are maintained, but the conditions of the roads over which they are driven and the happenstance striking of damaging objects.*
216 N.E.2d at 247.

[3] See also Mullen v. General Motors Corp., 336 N.E.2d 338 (Ill. App. 1975) (Judgment for the tire manufacturer. Finding only reasonable explanation for tire failure was underinflation damage); Wojciuk v. United States Rubber Co., 120 N.W.2d 47 (Wis. 1963) (Judgment for the tire manufacturer. Plaintiffs claimed the tire failed from a bonding or adhesion defect in vulcanization. Their expert, a professor in engineering, could not provide opinions of defect, particularly in a case where there was evidence of injury to the tire.). In Pinto v. Pyramid Tire, Inc., 597 N.Y.W.2d 714 (N.Y.A.D. 1993), judgment was granted in favor of the tire manufacturer after plaintiffs expert could not point to a specific defect in the tire and could not eliminate improper inflation or improper puncture repair as the cause of failure. Id. at 715-716.  Disregarding instructions for proper tire inflation can constitute misuse of a tire. Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 289 (5th Cir. 1975).  And failure to perform routine and proper care and maintenance can also constitute substantial alteration of a tire.  Korando v. Uniroyal Goodrich Tire Co., 637 N.E.2d 1020, 1025 (Ill. 1994).  See also La Plante v. American Honda Motor Co., Inc., 27 F.3d 731 (1st Cir. 1994) (alteration to ATV through faulty and inoperable brakes and underinflated tire).

[4] Although a number of Plaintiffs' topics use the terms "substantially similar," it is not at all clear what Plaintiffs intend that phrase to mean, particularly given the near all-encompassing scope of other topics and of their written discovery requests.  In the present case, Goodyear contends that the only substantially similar tires are ones built and cured to the same specifications, composed of the same compounds and reinforcements, and cured in a mold with the same mold shape and tread pattern geometry.  Stroble Affidavit ¶15.

*substantially similar* to the model at issue is truly the equivalent of comparing apples and oranges"); State ex. rel. Kawasaki Motors Corp., USA v. Ryan, 777 S.W.2d 247, 252 (Mo. App. 1989)(quashing order compelling production of information related to all models of ATVs manufactured by Kawasaki, including depositions in all ATV cases for a seven year period, noting that the requests were "not limited by time considerations . . . or to the same or similar . . ." models and finding that discovery was so broad as to be "defectively oppressive, burdensome and intrusive"); see also, American Medical Systems, Inc. v. Osborne, 651 So. 2d 209 (Fla. 2nd DCA 1995)(where defendant presented evidence demonstrating differences between the product at issue and other products, and the plaintiffs merely argued that the other products were substantially similar, discovery concerning other products was disallowed); Nissan Motors Corp. v. Espinosa, 716 So. 2d 279 (Fla. 4th DCA 1998).

In Barcenas v. Ford Motor Company, 2004 WL 2827249 (N.D. Cal. 2003), plaintiff sued to recover damages she suffered when the right rear tire tread separated causing the vehicle to over steer, roll and crash. The vehicle was equipped with Daytona Radial Stag tires. Id. at 1. Plaintiff moved to compel defendant to produce a category of documents that related to other recalled tires including ATX, ATX II and Wilderness AT tires (collectively the "Firestone Radial ATX and Wilderness AT tires") arguing that they were substantially similar to the Daytona Radial Stag tire. Id. at 3. The court considered the expert affidavit and deposition testimony submitted by both parties and stated that "[plaintiffs' expert's] analysis of the alleged similarities between the Daytona Stag tires and the Firestone ATX tires is generally conclusory."[5] Id. at 7. "[Defendant's expert] on the other hand, provides details in his deposition testimony to illustrate specific design differences between the two products." Id. "These design differences as well as

---

[5] Plaintiff's expert did not testify as to any similarity between the Daytona Stag tire and the Firestone Radial ATX tires or the Wilderness AT tires. As a result, the court denied plaintiff's motion with respect to documents relating to those tires. Id. at 5.

others have persuaded the court that Firestone ATX II tires and the Daytona Stag tires are essentially different products and that such discovery is not relevant to this action. Therefore, Plaintiff's request for documents relating to Firestone II tires is denied." Id.

The central issue in a product liability action is whether the specific product alleged to have caused the injury was defective when it left defendant's control. In this case, the product that Plaintiffs allege to be defective is a Goodyear Radial ATR Pathfinder LT215/75R15 tire manufactured at the Valencia, Venezuela, plant in 1997. As is explained above, evidence regarding other tires manufactured in other sizes to different specifications at different times and places is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence since those tires are not "substantially similar" to the subject tires. Indeed, evidence of the condition of other products is generally inadmissible to prove a defect in a particular product. See, Detroit T. & I. R.R. v. Banning, 173 F.2d 752, 756 (6th Cir.), cert. denied 338 U.S. 815 (1949); Clark v. Detroit & Mackinac Ry., 163 N.W. 964, 968 (Mich. 1917).

The rule requiring substantial similarity is of particular importance in tire cases. Courts throughout the country have routinely recognized that the mere fact that a tire fails is not proof that the tire was defective. As noted in Williams v. U.S. Royal Tires, 101 So. 2d 488 (La. App. 1st Cir. 1958):

> It cannot possibly be presumed or said that the blowing out of this tire was solely because of a defect therein by the alleged manufacturer . . . There are numberless means or causes other than a defect in the manufacture, which bring about a blowout of a tire.

Id. at 492.[6] Similarly, in Bright v. Firestone Tire and Rubber Company, 756 F.2d 19, 23 (6th Cir. 1984), the court held that a congressional report concerning "problems" with the "Firestone 500

---

[6] See also Shramek v. General Motors Corp., 216 N.E.2d 244, 247 (Ill. App. 1966); Franov v. Exxon Co. U.S.A., 577 N.Y.S.2d 392, 393 (App. Div. 1991); Plouffe v. Goodyear Tire & Rubber Co., 373 A.2d 492, 496 (R.I. 1977); Goodyear Tire & Rubber Co. v. Hughes Supply, Inc., 358 So. 2d 1339, 1342 (Fla. 1978); Van Winkle v. Firestone

tire", consisting of "empirical data regarding accidents, lawsuits and consumer complaints involving the 500 . . . was not based on any investigation into specific defects or manufacturing problems." The court also ruled that "showing that the public generally had more problems with the Firestone 500 then with other tires does not provide that the particular tire involved *in this case* was defective, and it has nothing to do with whether a tire defect caused *this particular accident.*" Id. See also Fowler v. Firestone Tire and Rubber Co., 92 F.R.D. 1, 4 (N.D. Miss. 1980) (excluding evidence regarding tires produced under different specifications at a time remote from the production of the accident tire because it would unnecessarily confuse the issue before the court.)[7]

Since tires fail for a variety of circumstances, and because the relationship of similarity between tires cannot be correctly shown by selecting a single component or even groupings of components the Court should not permit the free-ranging discovery Plaintiffs seek through their Notice. Rather, the Court should sustain Goodyear's objections to that Notice and thereby limit the corporate representative deposition of Goodyear to an appropriate scope of products liability relevance.[8]

### B.   Discovery Concerning Service Life is Completely Irrelevant to This Case

---

Tire & Rubber Co., 253 N.E.2d 588, 591 (Ill. App. 1969); Sears, Roebuck & Co. v. Haven Hills Farm, Inc., 395 So. 2d 991, 995-96 (Ala. 1981); Fuller v. Sears, Roebuck & Co., 186 Cal. Rptr. 26, 29 (Cal. App. 1982); Woelfel v. Murphy Ford Co., 487 A.2d 23, 24-25 (Pa. Super. 1985); Jolley v. General Motors Corp., 285 S.E.2d 301, 304 (N.C. App. 1982).

[7] See also Uitts v. General Motors, 62 F.R.D. 560, 562-63 (E.D.Pa. 1974)(holding that evidence of a recall campaign involving a different model vehicle was not discoverable); State ex. rel. Kawasaki Motors Corp. U.S.A. v. Ryan, 777 S.W.2d 247, 242 (Mo. App. 1989)(quashing discovery not related to the same model at issue); Earl v. Gulf and Western Mfg. Co., 366 N.W.2d 160 (Wis. App. 1985), (finding an abuse of discretion in permitting discovery concerning products other than the precise model that allegedly caused the injury).

[8] Somewhat emblematic of Plaintiffs' scattergun (or perhaps boilerplate) approach to discovery is topic "g" which asks for testimony concerning "[a]ny manufacturer's evaluation of Goodyear between 1998-2004 regarding Goodyear's potential to manufacture original equipment tires and the identities of person(s) with knowledge of same." The first thing to note is that the timeframe identified is *after* the subject tire was built. In addition, Plaintiffs here already *know* from jurisdictional discovery that the subject tire was never sold as original equipment but was sold exclusively to Discount Tire Company. See also Stroble Affidavit at ¶ 32.

Eight of Plaintiffs' topics pertain to matters relating to tire service life. See topics "v" – "cc". They have, for example, asked for information about Goodyear's research activities "throughout the world" relating to the topic of tire service life, and "all testing and research conducted to reduce rubber fatigue resistance within a tire's structure. . . ." See topics "v" and "z".

Plaintiffs have come forward with absolutely no basis for requiring Goodyear to provide information about such matters. As explained in Barcenas, supra, "[s]ome threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." Barcenas, 2004 WL 2827249 (N.D. Cal. 2004), *2 (quoting Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992)). Plaintiffs cannot make such a "threshold showing" in this case. The subject tire was less than five years old at the time of the accident. There is no tire industry standard that would support a claim based on tire service life in this case. No tire industry group or tire manufacturer has recommended that tires of the same age as the subject tire be removed from service based solely on the age of the tire. See Stroble Affidavit, ¶ 34. Because this is yet another example of Plaintiffs' refusal to acknowledge appropriate boundaries of discovery relevance, the Court should not require Goodyear to produce witnesses on this subject and should sustain Goodyear's objections.

## C.   Goodyear's Trade Secrets Must be Protected

While it is not entirely clear from the wording of the topics in Plaintiffs' Notice, it is possible that Plaintiffs may be seeking information pertaining to Goodyear's trade secret rubber

formulas and/or properties. Goodyear's rubber compound formulas are protected from discovery by the trade secret privilege. See NMRA 11-508. If Plaintiffs are not seeking such information, then the Court need not consider this section of Goodyear's memorandum, but Goodyear discusses this issue below to ensure that its trade secrets are not compromised.

The tire business is highly competitive. Competitors are always seeking to gain any advantage, whether it is more lead-time for the introduction of new products, or an understanding of the competition's methods, thinking, goals and strategy. Stroble Affidavit ¶ 36. Goodyear takes important steps to ensure that its trade secrets and competitively sensitive information remain strictly confidential. Even after a new model tire is released to the public, the specific technical information about the tire is treated as confidential, a commercial trade secret and proprietary information by Goodyear. Disclosure of such information to a competitor would give the competitor information that otherwise could not be obtained. From this information the competitor could realize substantial cost savings or make adaptations. This would severely and unfairly reduce Goodyear's competitive advantage. Stroble Affidavit ¶ 37.

For these reasons, Goodyear takes steps to ensure that competitively sensitive trade secret and confidential information remain confidential within the company. Goodyear preserves the secrecy of its trade secret information by limiting the availability of this information within Goodyear to those who truly "need to know" and by securing from those employees with access to the secrets a written promise to preserve the confidentiality of this information. Stroble Affidavit ¶ 38.

Numerous security procedures are in place to preserve Goodyear's trade secrets. Goodyear's policies with regard to dissemination of confidential information are given to all new employees when they are hired at Goodyear. Those policies include prohibition of, among other

things, disseminating any information as to design, materials, construction, manufacturing equipment and processes, warranty policies, and testing and failure analysis. Goodyear regularly sends reminders of those policies to Goodyear employees who may have exposure to personnel from other tire companies. Id.

Goodyear's designs and engineering findings and procedures have been developed at great expense, are not made available to the public, and are maintained as confidential documents under Goodyear's security system. Access to company buildings is restricted via key card and/or guards. Transport of documents between buildings by Goodyear associates is strictly controlled. Id.

Goodyear employees agree not to disclose to persons outside of the company any trade secrets or other confidential company information without the company's permission. Goodyear employees who are given access to computer systems have a user identification number and password and must agree not to disclose their passwords to others. Employees with computer access also must agree not to intentionally attempt to access computer programs or data files that they have not been authorized to access. Job responsibilities govern as to what computer or other information a particular employee is given access. Employees must return all company documents containing any confidential or trade secret information when they terminate their employment with Goodyear. Stroble Affidavit ¶ 39.

Access to Goodyear's tire manufacturing plants is restricted. Any person who is not a Goodyear employee assigned to work in the plant must obtain approval in writing to enter the plant. This includes management-level Goodyear employees who do not work inside the plant itself. All of the security precautions outlined in this and the preceding paragraphs are maintained at significant cost to Goodyear for the purpose of safeguarding its trade secrets and

18

confidential information. Goodyear makes a significant investment each year on all of its combined security measures. Stroble Affidavit ¶ 40.

Information concerning Goodyear's tire formulas is trade secret information. It is not disclosed to Goodyear's competitors and has cost millions of dollars to develop through extensive research and development. Goodyear has developed unique rubber compounds, processes and equipment known or owned only by Goodyear. This information is one of the primary means by which Goodyear gains an advantage over its competitors. It has allowed Goodyear to save costs, improve efficiency and improve product quality. Goodyear would be severely harmed by its disclosure. A competitor could not learn or duplicate this information except for its disclosure through this lawsuit. Only employees that need to know this information are provided it, and it is not provided to anyone outside of Goodyear. Stroble Affidavit, ¶¶ 41-42.

New Mexico's Uniform Trade Secrets Act ("the Act") protects against the actual *or threatened* misappropriation of trade secrets. See NMSA 1978, § 57-3A-3. Misappropriation can include the disclosure or use, without consent, of a trade secret by one who acquired it under circumstances giving rise to a duty to maintain its secrecy or limit its use. See NMSA 1978, § 57-3A-2. The Act provides that, under appropriate circumstances, "affirmative acts to protect a trade secret may be compelled by a court order." Id. Goodyear seeks such an affirmative act in this case. Specifically, Goodyear seeks an Order protecting from disclosure Goodyear's trade secret information concerning its rubber compounds and their formulas/properties.

Furthermore, New Mexico has codified a specific privilege for trade secrets and *mandates* protective orders to safeguard them:

> A person has a privilege, which may be claimed by the person or
> the person's agent or employee, to refuse to disclose and to prevent

19

> others from disclosing a trade secret owned by the person, if the
> allowance of the privilege will not tend to conceal fraud or
> otherwise work injustice.

NMRA 11-508 (emphasis added). Plaintiffs cannot show that protection of Goodyear's trade secrets in this case would conceal a fraud or work an injustice.

Goodyear's tire formulas and manufacturing processes are the "Rosetta Stone" of the company. The formulas are not disclosed to Goodyear's competitors and have cost millions of dollars to develop through extensive research. A competitor could not learn or duplicate this information except through its disclosure in this lawsuit, and maintaining the confidentiality of these formulas protects Goodyear's competitive advantage. Goodyear has gone to great lengths and incurred millions of dollars in expense to maintain the confidentiality of its trade secrets.

Moreover, courts have held routinely that information of this type is considered to be trade secrets. See In re Bridgestone/Firestone, Inc., 106 S.W.3d 730 (Tex. 2003); In re Continental General, 979 S.W.2d 609 (Tex. 1998); Bridgestone/Firestone, Inc. v. Superior Court of Alameda County, 7 Cal. App. 4th 1384, 9 Cal.Rptr.2d 709 (Cal.Ct.App. 1992). In Bridgestone/Firestone, the court held that the company's skim stock formula was immune from discovery because they were admittedly trade secrets and plaintiffs failed to establish that the formulas were necessary to fairly adjudicate their claim. Id. at 737-37 (O'Neill, J concurring). In Continental General, the plaintiffs conceded that the formula was a trade secret. Id. at 615. In Superior Court, the appellate court quashed a trial court's order compelling Firestone to produce its trade secret rubber compound formula. The appellate court found that this information constituted trade secret, and plaintiff failed to make a prima facie showing that the formulas were in "fact relevant and necessary to the proofs." Id.

Based on the foregoing, the Court should prohibit inquiry into the formulas/properties of Goodyear's rubber compounds, and should sustain Goodyear's objections in connection therewith. Goodyear should not be required to divulge such trade secret information.

## III.  CONCLUSION

Goodyear will incur considerable expense in arranging for testimony in response to Plaintiffs' 30(b)(6) Notice.   The Notice, however, is unacceptably overbroad, seeking information about hundreds or thousands of different tires, lacking any – much less reasonable – time constraints or limitations as to the manufacturing facility involved in this case, and delving into subjects for which Plaintiffs have no credible, threshold basis for seeking information. While Goodyear will produce witnesses in response to the Notice at the appointed time and place, it respectfully submits that its objections to Plaintiffs' Notice are well-founded in fact and law, and those objections should be sustained by the Court through entry of a protective order.

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.

By _____
R. E. Thompson
Donald A. DeCandia
Attorneys for Defendant The Goodyear
Tire & Rubber Company
P.O. Box 2168
Albuquerque, NM 87103
Telephone:  (505) 848-1800

and

HARTLINE, DACUS, BARGER, DREYER & KERN, L.L.P.
Scott G. Edwards
Attorneys for Defendant The Goodyear

21

Tire & Rubber Company
6688 North Central Expressway, #1000
Dallas, TX 75206
Telephone: (214) 346-3729

WE HEREBY CERTIFY that a true and correct copy of the foregoing was emailed and/or
mailed by First Class Mail as indicated below to the following counsel of record this __9th__ day of
June, 2006:

Via Email & First Class Mail:
David J. Jaramillo
Gaddy Law Firm
2025 San Pedro, NE
Albuquerque. NM 87110

David J. Stout
Carpenter & Stout, Ltd.
1600 University Blvd., Suite A
Albuquerque, NM 87102

Via First Class Mail:
Martin R. Esquivel
Narvaez Law Firm, P.A.
P.O. Box 25967
Albuquerque, NM 87125-0967

Mike Clemens
Butt, Thornton & Baehr
P.O. Box 3170
Albuquerque, NM 87190

Sean Olivas
Keleher & McLeod
P.O. Box AA
Albuquerque, NM 87103

MODRALL, SPERLING, ROEHL,
HARRIS & SISK, P.A.

By _____
       Donald A. DeCandia
K:\dox\client\36239\128\W0597521.DOC



# GADDY LAW FIRM
### LAWYERS

2025 San Pedro Drive N.E.
Albuquerque, NM 87110-5951
Phone (505) 254-9090
Fax   (505) 254-9366

*Philip C. Gaddy\**
*David J. Jaramillo*
*Maria E. Touchet*
*\*Also Licensed in Texas*

www.gaddyfirm.com
Phil@gaddyfirm.com
David@gaddyfirm.com
Mia@gaddyfirm.com

May 11, 2006

*Via Facisimile*

Don DeCandia, Esq.
R.E. Thompson, Esq.
Modrall Sperling, Roehl,
   Harris & Sisk, P.A.
P.O. Box 2168 (87103)
500 4ᵗʰ Street NW #1000
Albuquerque, New Mexico  87102

> Re:  Gonzales et al. v. Goodyear et al.
> CV-2005-941 BB/LFG

Dear Mr. DeCandia:

This responds to the letter we just received by fax from you. As to our conversation last week, it largely concerned your Motion regarding Mr. Carlson. I did take that opportunity to tell you that we needed a response to our discovery letter as soon as possible and certainly before you left. Was your plan to fax or mail us a letter on the day you leave early next week? You are out after next Tuesday the 16ᵗʰ. Our request for a response by today was with the hope that we would have adequate time to discuss your response in person, by phone or by letter. This was to ensure we did not face further delay or of being put in a position of trying to move this case along by filing our motion to compel and then be confronted from you with accusations of failing to confer prior to filing. Most importantly, we do not plan on utilizing all the time we have to file the motion to compel, as we needed the information requested when it was due in April and cannot further delay asking the Court to order it produced. If we do not hear from you, we will file the motion to compel and the record of our attempts to confer with you will speak for itself. Understand, however, that we will not wait for you to respond until after you return. Perhaps your partner Mr. Thompson or one of the folks from the Dallas firm can pitch in and help you with this issue.

As to the deposition requests, while you may have never seen a 30b6 notice like we sent, we have no doubt that your client has seen many like it. It is clear that you, like us, are litigating a tire case for the first time. Given that this is our first tire case, we need to gather as much information about tire design and manufacturing as we can to understand what is relevant and what the important issues for the jury will be. In other words, we need to understand the lay of the land before we can even begin the relevant discovery. Your client, on the other hand, cannot



EXHIBIT
A

hide behind your lack of understanding in responding, as it has all of the information requested and is selectively spoon feeding both of us. Your difficulty is really immaterial. While you may have difficulty responding to our requests, your client should have none. I believe the same is true of your co-counsel Mr. Edwards, who, we understand, is frequent counsel in these cases. With the hope that we would actually get information in your April supplemental answers we requested 30b6 deposition dates in early April. You asked for the notice and I sent you one. *See our email exchange on 4/12/06.* Your discovery responses then identified only two witnesses, and we promptly asked for depositions for those individuals. After an extended silence from you, I emailed and wrote you again this week. You now have given me dates almost six weeks from today, over two months after first requested, and only two weeks before our expert reports are due. Your clients plan to hamstring our efforts to litigate this case is becoming apparent. When have you ever been able to delay depositions for this length of time in a similar case? The bottom line is that we asked for these dates in early April and we should not have to wait over two months to get to take these depositions. Will your client be reasonable in this case and give us earlier dates?

Sincerely,

David J. Jaramillo
david@gaddyfirm.com

cc:     David J. Stout, Esq.
        Marty Esquivel, Esq.
        Mike Clemens, Esq.
        Sean Olivas, Esq.



MODRALL SPERLING

L A W Y E R S

May 26, 2006

Donald A. DeCandia
505.848.1800
Fax: 505.848.1889
dad@modrall.com

<u>VIA FACSIMILE</u>
David J. Jaramillo, Esq.
Gaddy Law Firm
2025 San Pedro Drive, NE
Albuquerque, NM 87110

Re:    <u>Stephanie Gonzales, et al. v. The Goodyear Tire & Rubber Company, et al.</u>
       United States District Court, District of New Mexico, No. CV-05-0941 BB/LFG

Dear Mr. Jaramillo:

       This letter responds to your May 22, 2006 correspondence concerning Goodyear's supplemental discovery responses. You had indicated that you wanted a response by today. Because I was out of the office when your letter arrived, I do not have time to respond to each individual matter in your letter. Nevertheless, in an effort to meet your timetable I will address a couple of key points.

**Proper Scope of Discovery**

       You propose that the appropriate scope of discovery is all "14, 15, 16, and 17 inch load range C, D and E light truck tires with a width between 185 and 275 millimeters, a speed rating of 130 mph below...". This scope is unacceptably overbroad not only in terms of the fact that it would entail completely irrelevant information about products that are nothing like the product involved in this case, but also because it is unlimited in terms of such factors as date of manufacture and place of manufacture. The reason you give is that it would be "relevant to Goodyear's experience and knowledge with steel belts...". As I mentioned in my last letter to you, there are approximately 415 different tire codes for steel belted radial light truck tires. You have not narrowed that scope by much if anything. Indeed, you tell us that for some claims you need information about "all steel belted radial tires," thereby *expanding* the scope well beyond even the 415 different products. We strongly disagree with your proposal to put Goodyear to the extraordinary expense of compiling all this irrelevant information for you. In the hopes of reaching a rational compromise, however, we would be willing generally to agree to providing information on common green tires with the same tread pattern, subject of course to other objections.

Modrall Sperling
Roehl Harris & Sisk P.A.

Bank of America Centre
500 Fourth Street NW
Suite 1000
Albuquerque,
New Mexico 87102

PO Box 2168
Albuquerque,
New Mexico 87103-2168

Tel: 505.848.1800
www.modrall.com



EXHIBIT
B

Page 2

## Contention Interrogatories

It appears that you believe Goodyear should respond to contention interrogatories before it has any information from you as to the theories of defect you are alleging in this case, and you remain unwilling to supplement your answers to contention interrogatories. In support of your approach, you go so far as to state that Plaintiffs have no information about the cause of their accident. If that were true, then how were you able to file two complaints in this case? Of course, as pointed out previously, this issue ties into the appropriate scope of discovery. We apparently will have to agree to disagree about whether you are entitled to discovery of an enormous wealth of information simply because you have been unwilling to specify what you believe was wrong with the product and what caused the accident.

I am hopeful we can resolve these and other issues and look forward to your thoughts. Please feel free to contact Scott Edwards or me as we continue to try to work things out. Thank you for your attention to these matters.

Sincerely,

Donald A. DeCandia

DAD/jj
cc:    David J. Stout, Esq. (Via Fax)
       Marty Esquivel, Esq. (Via Fax)
       Mike Clemens, Esq. (Via Fax)
       Sean Olivas, Esq. (Via Fax)
       Scott G. Edwards, Esq. (Via Fax)
W0595215.DOC