# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

STEPHANIE GONZALES, et al.,

        Plaintiffs,

v.                                          No. CIV 05-941 BB/LFG

THE GOODYEAR TIRE AND RUBBER COMPANY,
et al.,

        Defendants,

ALICIA MARIE HOLGUIN, et al.,

        Plaintiffs-Intervenors

v.

THE GOODYEAR TIRE AND RUBBER COMPANY,
et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART DEFENDANT GOODYEAR'S
## MOTION FOR PROTECTIVE ORDER CONCERNING
## AMENDED NOTICE TO TAKE 30(b)(6) DEPOSITION

THIS MATTER is before the Court on the Motion for Protective Order of Defendant The Goodyear Tire & Rubber Company Concerning Amended Notice to Take 30(b)(6) Deposition [Doc. 105], filed herein on June 9, 2006.

Plaintiffs and Plaintiff-Intervenors (hereinafter referred to collectively as "Claimants") filed their Response [Doc. 124], and Defendant The Goodyear Tire & Rubber Company ("Goodyear") filed its Reply [Doc. 144] on July 24, 2006, and the motion is now fully briefed. For the reasons detailed below, the Motion for Protective Order will be granted in substantial part.

<u>Factual and Procedural Background</u>

This case arises from an automobile accident occurring in August 2002, in which Adolfo Michael Valencia and Mary Alice Valencia were killed and Mary Alice's son, Gerald Padilla, was injured.  Claimants contend that the accident was caused, *inter alia*, by a design or manufacturing defect in a Goodyear tire, which defect resulted in separation of the tire tread and caused the rollover accident.  They contend further that alternative tire designs were feasible at the time of manufacture, including a nylon overlay which renders tread separation less likely and which is used in other lines of Goodyear light truck tires.

The discovery process in this action has been tumultuous, and disputes on the scope of discovery have virtually brought this litigation to a halt.  The parties have applied to the Court numerous times to resolve discovery disputes, and there are now motions seeking to impose sanctions due to alleged discovery abuses.  Along with the present motion, now pending before the Court are seven other discovery-related motions [Docs. 99, 116, 122, 139, 142, 146 and 147] filed by Claimants between June 5 and July 26, 2006.  If the intent is to bury the opposition under an avalanche of paper, that certainly is succeeding.  Some of these motions are not yet fully briefed.  In these motions and their supporting memoranda, Plaintiffs include page after page of identical arguments, authorities, and language.  One of the Motions, Plaintiff's Motion to Vacate Trial Setting and Extend Discovery Deadlines [Doc. 139], ends with a request that the Court "deny Goodyear's Motion for a Protective Order," obviously a typographical error, but one which indicates a wholesale lifting of arguments from one motion to the other.[1]

---

[1]While this Memorandum Opinion was being drafted, the parties filed another discovery-related motion, their Stipulated Motion to Vacate Trial Setting and Extend Pretrial Deadlines [Doc. 152].

The numbers of motions filed and the disputes over the discovery process the remind the Court of U.S. District Judge Raymond Acosta's lamentation about liberal, unchecked discovery and its impact on motion practice and litigation.

He said:

> The combined effect of these changes [the adoption of the Rules of Civil Procedure] was explosive.  Lawsuits became increasingly more complicated, and the preparatory phases of these ever-more-complex actions took on a nightmarish quality: discovery swelled to unwieldy proportions . . . and often became prohibitively expensive.

In re San Juan Dupont Plaza Fire Litigation, 859 F.2d 1007, 1010 (1st Cir. 1988).  He concluded, "Paper manufacturers sang hosannas."  Id., at 1011.

So, too, here.  The discovery motion practice is extraordinary.  Plaintiffs are concerned about what they see as a lack of cooperation and resistance to their discovery requests on the part of Goodyear.  However, this barrage of multiple motions, each containing identical arguments, is not helpful.  The following discussion is applicable to all of the pending discovery motions and will not be repeated but merely referenced in orders the Court will be issuing on each of these motions.

In the present motion, Goodyear seeks a protective order shielding its corporate representatives from the broad scope of inquiry outlined in Plaintiff's Amended Notice to Take 30(b)(6) Deposition, served May 16, 2006 (the relevant portion of which is included as Ex. A to Doc. 105).  In their Notice, Plaintiffs direct that Goodyear's corporate representatives be prepared to discuss 36 separate topics relating to Goodyear tires.  The parties' primary disagreement with respect to these depositions arises from their differing views on the proper scope of discovery.  The parties agree that at least some information regarding tires other than the subject tire would be discoverable, if the other tires are "substantially similar" to the particular tire involved in this litigation – that is,

3

Goodyear's Pathfinder Radial ATR LT215/75R15 light truck tire manufactured in Valencia, Venezuela during the 36th week of 1997.

Goodyear contends that the only tires sufficiently similar to the subject tire to justify discovery is the group of steel belted radial light truck tires made from the same green tire, cured in the same mold shape, with the same tread geometry, during the same time period, in the same plant in Valencia, Venezuela.

Claimants contend that they need information on the development, design, testing, manufacture and distribution of a wide range of Goodyear tires. At various points in their discovery requests, Claimants ask for information about different categories of tires, including in some instances requests for information on all Goodyear tires. This is clearly too broad a scope, as it would include information irrelevant to the design and manufacturing process for the subject tire and would entail excessive burden and expense to Goodyear with little or no benefit to the litigation.

At one point in their briefing on this motion, Claimants argue that they should be allowed to discover information about all steel-belted radial tires. In their Motion to Determine the Scope of Discovery [Doc. 146], filed herein on July 24, 2006, Claimants state that they offered to narrow the scope of discovery to "14, 15, 16 and 17 inch load range C, D and E steel belted radial light truck tires with a width between 185 and 275 millimeters and a speed rating of 130 MPH and below" [Doc. 146, at 3], but that Goodyear rejected this offer. Claimants do not provide any expert testimony or other information to explain how they arrived at that particular group of tires and why other tires in that group are, in their view, sufficiently similar to the subject tire so that discovery is justified across that particular range of Goodyear products.

The Court is therefore tasked with determining whether to limit discovery to the relatively

narrow group of tires described by Goodyear or, alternatively, to allow disclosure of information relating to some broader category, up to and including all Goodyear tires.  In addition, Goodyear raises issues in this motion regarding discoverability of material on tire "service life" and posits a trade secret privilege for protected information sought by Claimants related to Goodyear's rubber compound formulas.

Definition of Relevance for Purposes of Discovery

To be discoverable, evidence need not necessarily be admissible at trial.  Fed. R. Civ. P. 26(b)(1).  However, "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." Piacenti v. General Motors Corp., 173 F.R.D. 221, 224 (N.D. Ill. 1997).

Rule 26, as amended in 2000, provides that parties may obtain discovery regarding any matter, not privileged "that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  Prior to 2000, discovery was permitted of all information, not privileged, which was relevant to the "subject matter" involved in the action.

The 2000 amendment significantly narrowed the scope of permissible discovery.  The Advisory Committee comments to the amendment make clear that the changes were, in fact, intended "to address concerns about overbroad discovery."   Advisory Committee Comment to 2000 Amendment to Rule 26(b)(1).  The amended rule includes a provision under which the court may allow discovery beyond the narrower range of "claims or defense," but only if good cause is shown therefor:

> The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to

5

> develop new claims or defenses that are not already identified in the pleadings . . . . [However], [t]he court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

Id..

In addition, the Advisory Committee notes that a sentence was added to the end of Rule 26(b)(1), calling attention to certain limitations of subdivision (b)(2) – that is, the court may limit discovery if it would be unreasonably cumulative or duplicative, or if the party already had ample opportunity to obtain the requested material, or if the burden or expense outweighs the benefit – and notes that "[t]his otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery." Id..

It was widespread discovery abuses, escalating costs of litigation and resulting delays in the final disposition of cases that, in 1990, compelled Congress to take action to curb litigation excesses. Courts and Congress both were concerned with problems caused by improper litigation tactics. Discovery was often seen as a hammer intended to beat one's opponent into submission which often prompted a resistance response – an impenetrable shield intended to obfuscate and divert – rather than as a method to discover facts relevant to the case. The unlimited discovery then favored by the federal rules allowed for wave after wave of written discovery, endless depositions and discovery requests, all of which substantially increased the costs of litigation and contributed to delay. Congress responded to these kinds of abusive litigation tactics with the adoption of the Civil Justice Reform Act, 28 U.S.C. § 471 et seq. (CJRA), and the subsequent revision of the Federal Rules of Civil Procedure.

The information explosion of recent decades has greatly increased

> both the potential cost of wide-ranging discovery and the potential for
> discovery to be used as an instrument for delay or oppression . . . .
> The revisions in Rule 26(b)(2) are intended to provide the court with
> broader discretion to impose additional restrictions on the scope and
> extent of discovery . . . .

Advisory Committee Comments to 1993 Amendments to Rule 26(b). *See also*, <u>Malautea v. Suzuki</u>

<u>Motor Corp.</u>, 148 F.R.D. 362, 377 (S.D. Ga. 1991), wherein the court entered default judgment as

a sanction for discovery abuses and commented that "[p]erhaps it is the attitude and conduct

manifested in this case, and other instances, that persuaded Congress to enact the Civil Justice Reform

Act of 1990."

 Both the statute and rule revisions were intended to address the dual problems of cost and

delay.  Parties are longer be permitted to engage in *carte blanche*, unrestricted discovery.  So as to

reduce the possibility that a party will engage in needless, abusive or expensive discovery, the rules

prohibit any discovery at all until the parties have conducted their meet-and-confer session and come

up with a case management plan.  Fed. R. Civ. P. 26(d); D.N.M.LR-Civ. 26.4(a).  Moreover, the

rules impose specific limits on both the numbers of depositions authorized and the numbers of

interrogatories and subparts which may be served.

 The revised rules, specifically Rule 30(d), also call for limitations on the length of depositions,

and prohibit re-depositions, so as to lessen the burden on deponents and the costs to the parties. The

Rules of Civil Procedure were amended on the heels of the CJRA to dovetail with the Congressional

concerns relating to excessive discovery practices.  The CJRA and the federal rules contemplate

court-managed discovery and impose significant limitations on the discovery process.  This is

consistent with the dual goals of the CJRA, which were meant to reduce costs of litigation and to

expedite the ultimate disposition of a case. The CJRA contemplates court-managed discovery,

imposition of fixed and firm case management deadlines, and the creation of target disposition dates to ensure that a case is brought to final disposition within a specific and relatively brief amount of time.

Under the CJRA and the Federal Rules, parties must proceed cautiously and with circumspection with their discovery. Discovery choices and decisions are no longer the attorneys' sole prerogative; rather, most discovery must now be approved by the court. The court is required to balance a party's right to information with the opposing party's right to be free from vexatious, expensive and intrusive discovery demands. Because the parties no longer have unlimited numbers of depositions at their disposal, the parties must carefully analyze their discovery needs and utilize their allotted depositions and time carefully.

The same is true with written discovery. Because the procedural rules impose limits on the number of questions that may be asked, counsel must carefully formulate the precise questions for which they need responses. These limitations are not intended to tie an advocate's hands or unfairly limit the advocate's ability to learn the relevant facts. Rather, they are intended to require the advocate carefully to consider the expenses involved and make wise and prudent choices in terms of a client's discovery dollars and the client's needs for information.

The rules also impose a sense of fairness in the process by lessening the opportunities for abusive practices. However, some degree of flexibility is contemplated and strict limits are not rigidly imposed without consideration of the parties' needs. The Court always has the authority to grant more or less discovery than contemplated by the Rules and to strike an appropriate balance between the parties' needs and burdens. The goals of discovery remain the same – to ensure that all parties are able to discover information relevant to the case so as to facilitate rational settlement discussions

or, alternatively, to present the jury with a full picture of the facts. This is the impetus behind the 1993 innovation in the Federal Rules which requires parties, without awaiting formal discovery requests, to disclose certain basic information about the case. Fed. R. Civ. P. 26(a)(1); Advisory Committee Comment to 1993 Amendments.

Liberal discovery is not entirely a thing of the past; indeed, full discovery is necessary to the proper functioning of the adversary system. But that general principle must now be balanced against the need to curb abusive discovery practices in the interests of fairness and efficiency. And it is the Court's duty to oversee the process.

In support of Goodyear's contentions that Claimants' discovery goes beyond the strictures of Rule 26 and consists of the proverbial fishing expedition, Goodyear cites to the Claimants' correspondence. The Court is somewhat troubled with the statement made by counsel for Plaintiffs-Intervenors to Goodyear's counsel regarding Claimants' approach to the deposition notice at issue in this motion. Counsel stated in a May 11, 2006 letter:

> As to the deposition requests, while you may have never seen a 30b6 notice like we sent, we have no doubt that your client has seen many like it. It is clear that you, like us, are litigating a tire case for the first time. Given that this is our first tire case, we need to gather as much information about tire design and manufacturing as we can to understand what is relevant and what the important issues for the jury will be. In other words, we need to understand the lay of the land before we can even begin the relevant discovery.

[Doc. 106, Ex. A].

This statement is disarmingly candid and concedes that the proposed discovery is not limited to Rule 26's "relevant to the claims and defenses" standard, but is part of a learning process. Claimants' counsel "wants to gather as much information . . . as we can to under what is relevant .

. . ." This concession comes close to the tactic condemned by Congress and our own Circuit in <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d 1202, 1238 (10th Cir. 2000):  "When a plaintiff first pleads its allegations in entirely indefinite terms, without in fact knowing of any specific wrongdoing by the defendant, and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing, that plaintiff abuses the judicial process."

While the Court is sympathetic to Claimants' argument that the defendant corporation is in exclusive control of much of the information they consider relevant to their case, that does not justify a wholesale fishing expedition into Goodyear's files, and into the memories of its corporate representatives in deposition, in the hopes of turning up something relevant.  That process is simply no longer permitted in the post-CJRA era.

The deposition notice as worded is overly expansive, and Claimants' delineation of the group of Goodyear products for which it wants information is too broad.  The Court will therefore grant the protective order, in part, and will limit Claimants' requests as discussed below.[2]

<u>Scope of Discovery in Products Liability Cases</u>

As noted above, the parties are in agreement that discovery may be had with reference to design, testing and manufacture of products that are "substantially similar" to the tire at issue in this case.

The "substantially similar" test generally arises in products liability cases when a plaintiff seeks to discover, or to introduce at trial, information about other accidents involving the product alleged to have caused the injury.

_____

[2]The protective order set forth herein is not meant to supersede the earlier protective order filed in this case on January 26, 2006 [Doc. 52], which remains in effect.

> Evidence of similar accidents involving the same product is admissible
> . . . to establish notice, the existence of a defect, or to refute testimony
> given by a defense witness that a given product was designed without
> safety hazards . . . .   Generally, however, admission of evidence
> regarding prior accidents or complaints is predicated upon a showing
> that the circumstances surrounding them were substantially similar to
> those involved in the present case.  [Internal punctuation omitted].

Ponder v. Warren Tool Corp., 834 F.2d 1553, 1560 (10th Cir. 1987).

*See also*,  Rexrode v. Am. Laundry Press Co., 674 F.2d 826, 829 n.9 (10th Cir. 1982);

Julander v. Ford Motor Co., 488 F.2d 839, 846-47 (10th Cir. 1973) ("such evidence should be

carefully examined before being received to the end that the circumstances of the 'other accident'

bear similarity to the circumstances surrounding the accident which is the subject matter then on

trial").  The "other-accidents" evidence may also be relevant to show a culpable state of mind on the

part of the defendant, *e.g.*, persevering in a refusal to provide available safety features on a product

despite knowledge of other similar accidents.  Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1250

(10th Cir. 2000).

The Tenth Circuit also holds that while "a high degree of similarity will be essential" when the

issue is alleged dangerousness of the product, the rule requiring substantial similarity is relaxed when

the evidence is offered to prove that the defendant had notice or awareness of a dangerous condition.

Ponder, *supra*, at 1560; Wheeler v. John Deere Co., 862 F.2d 1404, 1407-08 (10th Cir. 1988).  And,

in general, "[t]he question of similarity necessarily depends upon the nature of the case and the

purpose for which the evidence is offered." Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1365

(10th Cir. 1987).  *Accord*, Four Corners Helicopters, Inc. v. Turbomeca, S.A., 979 F.2d 1434, 1440

(10th Cir. 1992) ("Substantial similarity depends upon the underlying theory of the case"); Smith v.

Ingersoll-Rand Co., *supra*, at 1247 ("We must consider, then, with considerable precision, not only

11

the facts of the other incidents but the theories under which plaintiffs urge their admission").

The rule of substantial similarity applicable to "other accidents" evidence has been applied as well to "other products" situations.

> Evidence of prior accidents is admissible in a product liability case to show that the claimed defect existed, that the defect caused the plaintiff's injury, and that the defendant knew or should have known of the existence of the defect . . . .  The evidence should be admitted only where the accidents occurred under conditions and circumstances similar to those of the accident which injured the plaintiff . . . .  The criterion "similar conditions or circumstances" includes similarity of the product involved.

Earl v. Gulf & Western Mfg. Co., 123 Wis.2d 200, 205, 366 N.W.2d 160, 163 (Ct. App. 1985) (limiting discovery to the particular model of punch press involved in the accident).

In Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1077 (5th Cir. 1986), the court reversed a verdict in favor of defendants on grounds the trial judge was too restrictive in disallowing evidence relating to other similar products:  "Appellant should be allowed to show, if she can, that products similar in all relevant respects to appellees' have a long history of unacceptable accident rates . . . ."

When a plaintiff seeks to discover or to introduce evidence of the design, testing or performance of other similar products, the courts generally require that the products be substantially similar to the one which allegedly caused the accident, citing grounds, *inter alia*, of disproportionate burden when weighed against slight probative value. *See, e.g.*, Staley v. Bridgestone/Firestone, Inc., 106 F.3d 1504, 1512 (10th Cir. 1997), wherein the court upheld a ruling disallowing evidence of a magazine article characterizing multi-piece truck tire rings as "killer" rings, because the case dealt with grader tires and the article with truck tires, and prejudice would outweigh probative value. *See also,*

In re Richardson-Merrell, Inc., Bendectin Prods. Liability Litigation, 97 F.R.D. 481 (S.D. Ohio 1983) (disallowing plaintiffs' request to discover information about defendant drug company's testing procedures on drugs, including the infamous Thalidomide, not involved in the litigation); Missouri ex rel. Kawasaki Motors Corp., U.S.A. v. Ryan, 777 S.W.2d 247 (Mo. App. 1989) (overturning order which allowed discovery relating to different models of all-terrain vehicle other than the one involved in the litigation).

The proponent of the other-accidents or other-products evidence has the burden of showing substantial similarity. Wheeler, *supra* at 1407; Black v. M & W Gear Co., 269 F.3d 1220, 1227 (10th Cir. 2001). And courts have required expert testimony to establish the similarity or lack thereof, when the issue would not be obvious to a lay person.

> [T]here has been no showing here that bladder tanks or wet-wing fuel systems are potential substitutes for metal fuel tanks . . . . [T]here is no . . . general understanding [on the part of lay persons] of the relation between various types of aircraft fuel systems . . . . Of course, the party seeking discovery need not prove its case on the merits in order to obtain disclosure. It must, however, make some threshold showing of relevance before the opposing party is obligated to open to discovery a variety of designs not directly at issue in the litigation. Here, such a showing could have been made, for example, through the affidavit of an expert in aviation engineering. Since it was not, the plaintiff's application for an order compelling discovery of information about these designs is denied . . .

Fine v. Facet Aerospace Prods. Co., 133 F.R.D. 439, 443 (S.D.N.Y. 1990).

Thus, the burden of demonstrating substantial similarity by expert evidence is on Claimants. *See also*, Ramos v. Liberty Mut. Ins. Co., 615 F.2d 334 (5th Cir.), *modified*, 620 F.2d 464 (5th Cir. 1980) (discussing extensive expert testimony at trial, from both sides, regarding similarity or lack thereof between different types of oil rig masts involved in collapsing incidents); Haynes v. Am.

Motors Corp., 691 F.2d 1268, 1271-72 (8th Cir. 1982) (the court citing testimony of expert as to

dissimilarities between two different models of Jeeps in excluding evidence from the operator's

manual of the non-subject model); Am. Med. Sys., Inc. v. Osborne, 651 So.2d 209, 211 (Fla. App.

1995):

> [W]e agree with AMSI [the defendant] that the record before the trial
> court was not sufficient to order AMSI to answer the three
> interrogatories at issue here.  AMSI filed sworn affidavits listing the
> specific product used . . . and describing it as significantly different in
> design and performance from other AMSI models.  To counter this,
> plaintiffs argued that the models are all in the same family and
> analogized to the trial court that the AMS 700 was a generic series
> like a Chevrolet Lumina where each year Chevrolet moves buttons
> around and adds different types of chrome, which are changes that do
> not relate to the failure of a mechanism, as happened in this case.  We
> conclude that this argument does not overcome the evidence before
> the trial court.  Should plaintiffs provide the trial court with proof that
> there is no significant difference in the different models, this would
> contradict AMSI's affidavits and the trial court then could revisit the
> issue.

*And see*, Piacenti v. General Motors Corp., *supra*, at 222, wherein the court initially denied

plaintiff's motion to compel answers to interrogatories seeking information on other vehicle models

manufactured by defendant corporation, without prejudice to renewal upon filing an expert opinion

verifying that the models "are sufficiently similar to the Suzuki Samurai that tests performed on the

Samurai would be relevant in determining liability with respect to the Geo Tracker [plaintiff's

vehicle]."  The plaintiff later submitted affidavits, but the court found them to be merely conclusory

statements of similarity which were well refuted by the defendant's detailed expert affidavits and

disallowed the discovery relating to models other than the one involved in the lawsuit.

*But see*, Paulsen v. Case Corp. 168 F.R.D. 285, 288 (C.D. Cal. 1996), in which the court

disallowed plaintiff's expert affidavit (which opined that various products of defendant corporation

were substantially similar) on grounds the witness was not qualified as an expert, but nevertheless allowed discovery relating to other products.  However, Paulsen is not persuasive here as it was decided under an explicitly-stated broad and liberal construction of Rule 26 relevance, an approach which this Court rejects.

It is certainly true, as Claimants observe, that other courts have allowed discovery of information relating to "other models" or similar products.  But in most of these cases, discovery was allowed across a variety of models of the product because the component parts used in the different models – the parts which were alleged to have caused the injury – were identical.  *See, e.g.*, Schaap v. Executive Indus., Inc., 130 F.R.D. 384, 387 (N.D. Ill. 1990) ("information concerning similar models that have the same component parts or structural defects, and the circumstances surrounding the marketing and sale of those models, may shed some light on the issues involved in this case"); Uitts v. Gen. Motors Corp., 58 F.R.D. 450 (E.D. Pa. 1972) (discovery allowed regarding different models of vehicle, but with identical parts); Frey v. Chrysler Corp., 41 F.R.D. 174, 176 (W.D. Pa. 1966) (discovery would be proper regarding complaints "from owners of 1965 Chrysler Imperials [the subject vehicle] or from owners of Chrysler automobiles using the same throttle-linkage assembly").

Plaintiff cites Tucker v. Ohtsu Tire & Rubber Co., 191 F.R.D. 495 (D. Md. 2000), wherein the court allowed plaintiffs discovery of documents related to a different lawsuit in another jurisdiction, even though one of these cases involved a light truck tire rather than a passenger tire, which was the product at issue in Tucker.  The court relied on the fact that plaintiffs were alleging the same defect as the plaintiffs in the other case – that is, improper adhesion of the components of a steel belted radial tire.  The opinion included no discussion of any expert evidence as to similarity,

merely the plain statement that plaintiffs established threshold relevance by pointing out that the same defect was alleged in both cases.

While this case supports the request of Claimants herein for broad discovery regarding all steel belted radial tires, this Court disagrees with the breadth of the <u>Tucker</u> ruling and finds that it goes against the thrust of Tenth Circuit precedent, which requires a showing of substantial similarity by the proponent, and is contrary to the limitations on the scope of discovery now imposed by the CJRA and revised Rules of Civil Procedure.  The showing made in <u>Tucker</u> would not be sufficient in this case.  In addition, the documents sought in that case were relatively compact and were already located in a file in the possession of defendant; thus, the burden and expensive of locating and gathering them up would be minimal.  That is not the situation facing Defendant in the present case, if the Court accepts Claimants' contention that they are entitled to world-wide discovery relating to numerous models of tires.

Claimants also cite <u>Mann v. Cooper Tire Co.</u>, 816 N.Y.S.2d 45 (App. Div. 2006), a tread-separation case in which the appellate court held "absurd" the lower court's ruling restricting the scope of discovery to tires with the same "green tire specification" manufactured in the same plant as the subject tire.  This limitation is similar to the one urged by Goodyear in this case.  <u>Mann</u> can be distinguished  from the present case by its reliance on New York state discovery law, which it characterized as "generous, broad, and . . . to be construed liberally."  <u>Id.</u>, at 51.  As noted earlier, this view of discovery has been seriously restricted in federal courts.

As discussed below, the affidavit of James Stroble submitted in this litigation [Doc. 105, Ex. C] sets out in detail reasons for Goodyear's position that discovery in this case should be limited to information regarding a set of tires much smaller than that urged by Claimants.  The Court finds  the

Stroble affidavit to be well reasoned and convincing, far from "absurd," and disagrees as well with the New York state court's view of relevance in tread-separation cases. It may well be that Claimants could have produced an expert affidavit to refute the Stroble statements and conclusions, but this, they failed to do. It was their burden to establish similarity, and that burden was not shouldered.

Claimants also discuss at length two fairly recent tread-separation cases involving Goodyear tires, one filed in state court in Webb County, Texas and the other in United States District Court for the Southern District of Texas. Both of these cases featured evidence by Stroble on the similarity issue, and in both cases, the courts rejected Goodyear's position and ordered discovery relating to a broader category of tires than Goodyear desired. Claimants argue that this Court should follow the lead of these two Texas courts and order extensive evidentiary hearings and an *in camera* inspection of documents.

The Court declines to do so. It is Claimants' burden to demonstrate similarity, and they have not yet provided the Court with any expert testimony to counter the Stroble affidavit. The Court finds the Stroble evidence on dissimilarity to be, in the main, persuasive and will follow the broad outlines of that testimony in setting the bounds of relevance in this case, with exceptions as discussed below.

In addition to questions of relevance, the court must also look to issues of burden, expense and potential for delay and confusion when considering evidence involving other products or other incidents. In C.A. Assocs. v. Dow Chem. Co., 918 F.2d 1485 (10th Cir. 1990), a case involving allegations that Sarabond, a mortar additive, caused the masonry in plaintiff's building to crack and fall off, the district court allowed evidence that several other buildings, also treated with Sarabond, experienced similar problems. The Tenth Circuit affirmed the trial court's ruling limiting the "other

buildings" evidence to nine other buildings rather than the 21 requested by plaintiffs. The court noted that while this evidence was relevant to demonstrate the long-term corrosive effect of the additive and to rebut certain anticipated defenses, nevertheless:

> Given the complexity of the subject matter, we agree that the potential for delay and confusion could multiply with each additional building offered into evidence. Moreover, Dow's defense rested upon an analysis of the structural forces that can cause cracking unrelated to Sarabond. Thus, each building added to the list would bring with it a whole history of design, construction, and performance and a whole metallurgical, chemical, and structural analysis. The court's ruling set an appropriate limit on the scope of evidence which either party could discuss at trial. In confining the number of buildings admissible at trial, the lower court prevented the jury from inferring that Sarabond was defective simply because many buildings had been investigated.

Id., at 1490.

The Sarabond case involved admissibility, rather than discovery, and of course the definition of relevance is more expansive at the discovery stage. Nonetheless, as noted above, the Court is obliged to limit discovery if a discovery request would put the opposing party to a heavy burden of time and expense to gather and produce evidence which has little relevance to the litigation.

> Plaintiff would have us define the relevant scope of inquiry as all Chevrolet vehicles with engine mounts like those installed in the Vockie vehicle . . . . [But] evidence that similar engine mounts in completely different vehicles may separate was properly excluded for its potential for confusion and prejudice far outweighs whatever minimal probative value it may have.

Vockie v. Gen. Motors Corp., 66 F.R.D. 57, 64 (E.D. Pa.), aff'd, 523 F.2d 1052 (3d Cir. 1975).

<u>Defining the Relevant Group of Tires in This Case</u>

Goodyear argues that discovery of information about its tires should be limited to the group of steel belted radial light truck tires made from the same green tire, cured in the same mold shape,

with the same tread geometry, during the same time period, in the same plant in Valencia, Venezuela, as tires outside this group are not sufficiently similar to the subject tire to meet the relevance test. Claimants seek information about a larger group of Goodyear tires.

In support of its Motion, Goodyear attaches the affidavit of James Stroble ("Stroble"), Manager of Goodyear's Product Analysis Department.  He states that he has been employed by Goodyear since 1978 in positions that involved designing, developing, engineering, specifying, building, testing and inspecting tires.  He is a member of the American Society for Testing Materials, Society of Automotive Engineers, the Akron Rubber Group and the Tire Society [Doc. 105, Ex. C, at 2], and has testified as an expert witness in prior tire cases.  Stroble states the following in his affidavit:

The tire at issue in this litigation is Goodyear Pathfinder Radial ATR LT215/75R15 Load Range C tire manufactured in Valencia, Venezuela.  The "LT" in the name stands for "light truck." The Load Range "C" comes from the guidelines of the Tire and Rim Association ("T&RA"), an industry group the purpose of which is, *inter alia*, to specify tire dimensions, maximum load carrying capacities and inflation pressures.   A tire like the subject tire, with a load rating of "C," is recommended by the T&RA  for a maximum inflation pressure of 50 pounds per square inch, and at its maximum inflation to carry a load of 1765 pounds.  [Id., at 2-3].

Stroble describes the six major components of any steel belted radial tire – the inner liner, the tire beads, the body plies, the steel belts, the tread, and the rubber sidewalls – and tells how tires are manufactured on a tire building machine.  He says that the uncured, or "green," tire is placed in a mold where specified heat and pressure are applied to cure the tire, resulting in chemical and physical changes so that the physical dimensions, properties and chemical composition of the finished tire are

different from the green tire.  [Id., at 4-5].  Stroble defines a "similar tire" as "one that is built and cured to the same specification, composed of the same compounds and reinforcements, and is cured in the same mold with the same mold shape and tread pattern geometry."  [Id., at 5].

Stroble states further that not all tires are similar; they cannot be effectively compared by looking at any one component or even a small group of components, and that identical green tires cured in different molds to yield different tread geometry may have substantially different performance characteristics.  He says that compounds and reinforcements such as wire coat stock (sometimes referred to as "skim stock"), and belt wire constructions may be used across different types of tires, and that only tires made from the same green tire specification, with the same tread design would have the same size, load carrying capacity, belt size, and components as the tire at issue; any other Goodyear tire would differ in some aspect that could have an impact on how the tire operates.  [Id., at 5-6].

Stroble also says that Goodyear produces a wide variety of tires, with a wide variety of specifications which are unique to each specific model and size.  Goodyear radial passenger and light truck tires are made in sizes to fit anywhere from 13 to 24-inch wheel diameters, and to fit a wide range of vehicles from small to large cars, small to large pickup trucks, sport utility vehicles, vans, campers and trailers.  In addition to size, he says, other individual components vary significantly, for example, the thickness of centerline and shoulder areas, tread gauges, tread width, belt widths, belt gauges, tread compounds, and rubber formulas.  [Id., at 6-7].

Different molds and different specifications are used for other light truck tires, as well as other passenger and medium truck tires, as compared with the subject tire; therefore, Stroble continues, passenger tires, medium truck tires and even other light truck tires produced from different

20

specifications would differ from the subject tires many ways, including section height, section width, molded base width, tread pattern, tread geometry, tread radius, and operational characteristics. Different rubber compounds with different performance characteristics are used for various components, including compounds for tire liners, ply coats, belt coats, tread caps, tread bases and sidewalls. [Id., at 7].

Stroble states further that, for these reasons, the subject tire cannot placed in the same category as all tires sharing the same skim stock, or all tires sharing the same common green tire but cured in a different mold, nor can they be grouped in a category with tires of different load ranges. In particular, Stroble says, the subject tire, which is in Load Range C ("LRC"), cannot be grouped together with other light truck tires in other load ranges, such as D ("LRD") or E ("LRE"), as Claimants would like to do. These three load ranges, C, D and E, include 23 lines of tires manufactured with at least 469 different specifications. [Id., at 7-8].

Stroble notes that Claimants are also seeking information about Goodyear's "Crown Integrity Team" studies of LRE tires. He says that this team's work was focused on improving the performance of LRE tires, including a review of manufacturing techniques and alternative design considerations for LRE light truck tires. He continues, "One of the issues the Crown Integrity Team investigated was a novel appearing failure mode involving Load Range E light truck tires." Stroble then goes on to delineate several differences between one particular LRE tire and the subject tire in this case, an LRC tire, as evidence that LRE and LRC tires are "substantially dissimilar," and therefore the Crown Integrity Team's study would be irrelevant in this litigation. [Id., at 8-9].

Stroble thus addresses in some detail the issue of "substantial similarity." Claimants state that with this testimony, Goodyear "provides a mind-numbing recital of differences among tires to support

21

its position that scope of discovery be narrowly limited." [Doc. 124, at 2]. While it is true that Stroble provides a great deal of technical information in his affidavit, that is the nature of a products liability case. And it is Claimants' burden to counter the showing made in this affidavit.

Claimants do not supply an expert affidavit of their own but raise various arguments to support their position that discovery should range beyond the subject tire. They note that Goodyear itself, in its internal operations, categorizes tires into broader groupings. They argue that courts in two other cases, described above, have rejected the very arguments put forth by Goodyear for a restrictive definition of the relevant group of tires, similar to those raised in this case and supported by the testimony of Mr. Stroble.

Claimants also point to investigations undertaken by engineering teams which Goodyear put together to study problems with tread separation in Goodyear steel-belted radial light truck tires in Load Ranges C, D and E. These studies were discussed in the deposition of Richard J. Olsen ("Olsen"), corporate representative for Goodyear, taken in this case on June 15, 2006. [Doc. 124, Ex. D]. Olsen stated in his deposition that the company's investigation into the tread separation problem was done across various types of tires and across various manufacturing plants. While the investigation focused on LRE tires, for the most part, it also included " a very small number of load range C's." [Id., at 84]. The studies also included tires in the LRD category. [Id., at 85]. The studies showed that including a nylon overlay helped reduce incidents of tread throw. [Id., at 90-91].

It is Goodyear's failure to use a nylon overlay on the subject tire that is the thrust of Claimants' lawsuit. It is Claimants' position in this litigation that Goodyear was aware that nylon overlays were effective in reducing tread throw problems in light truck tires, as early as the end of 1995, and that  the nylon overlay technology was feasible for use in all such tires, including LRCs.

They contend that the fact that the subject tire, in the LRC category, was not manufactured with a nylon overlay is evidence of defective design and/or manufacture.

Claimants point out that, although the engineering studies noted above focused on LRE tires, Goodyear decided to include nylon overlays in LRD tires on the basis of these studies without performing a separate investigation specifically on LRD tires.  From this, Claimants reason that Goodyear itself groups LRD and LRE tires together for purposes of engineering safety concerns, and that "thus, 'from an engineering standpoint, there are similarities among light truck tires such that Goodyear was able to rely on the work with respect to LRE tires in making the determination of whether it was appropriate to apply nylon overlays on LRD tires.'  *Id.*  Hence, the investigation, the solution, and the engineering were applicable to all light truck tires."  [Doc. 124, at 5-6].

The deposition of corporate representative Terrence Lee Parsons ("Parsons") [Doc. 124, Ex. E, at 93, 389-91] does support the statement that Goodyear began using nylon overlays in LRD tires, based on the study and investigation conducted on a group of tires which were predominantly of the LRE category.  However, the Court does not agree that this situation leads to the general conclusion which Claimants posit, that "the investigation, the solution, and the engineering were applicable to all light truck  tires," thus justifying discovery of masses of documents and information relating to LRE and LRD tires.

The Court accepts, in general, the approach set forth in the Stroble affidavit, which is the only expert evidence before the Court.  The fact that Goodyear may categorize its tires into broader groupings for other corporate purposes – for example, marketing – is not a sufficient answer to Stroble's detailed explanation as the substantial dissimilarities among Goodyear tires, as those dissimilarities relate to the issues in this case.  The Court agrees with Goodyear that the fact that it

identifies tires by load range for internal corporate purposes does not mean that the tires are legally "substantially similar" from an engineering standpoint in such a way as to render discoverable a wide range of information about all categories of tires.

The Stroble affidavit states that the relevant category of tires in this case is as follows: Goodyear's Pathfinder Radial ATR LT215/75R15 light truck tire (the "subject tire") and other tires made from the same green tire, cured in the same mold shape, with the same tread geometry, in the same plant in Valencia, Venezuela as the subject tire, during the 36th week of 1997. The Court is inclined to accept as the relevant group the definition put forth in the Stroble affidavit, based on the thorough and persuasive discussion therein of similarity, as well as the fact that Claimants' wide-ranging definition would put Goodyear to substantial burden and expense. Thus, in striking the appropriate balance between Claimants' right to discover evidence relevant to the claims and Goodyear's right to be free from burdensome and expensive discovery, the Court opts to give Claimant less than it asked for and to require Goodyear to produce more than it wanted.

Goodyear states in its briefing that, in the context of written discovery in this case, it once offered to expand the scope of discovery to include all "common green tires with the same tread pattern as the subject tire" [Doc. 106, at 5 n.1] but that Claimants never responded to this offer, apparently preferring to hold out for a broader scope of discovery. As it was Goodyear itself who suggested this alternative, it is clear that the burden and expense of providing discovery relating to this class of tires would not be excessive. In that light, and bearing in mind that the "substantial similarity" test can be relaxed somewhat when the information sought goes to issues of defendant's notice or awareness rather than purely to show defect, the Court will adopt the "common green tire, common tread" definition. Whether any of the material or information produced under this definition

will be admissible at trial is, of course, a different question.  At this point, the Court finds only that it relates to the claims and defenses of the parties and is therefore discoverable.

The Court therefore defines the relevant group of tires in this litigation to be as follows:  the subject tire and all other Goodyear tires made from the same green tire, and with the same tread pattern, as the subject tire.  No explicit restrictions on date or place of manufacture are part of this definition (although it is possible that the group as defined includes only tires made in the Valencia, Venezuela plant during a particular period; the parties have not provided this information to the Court).

This definition extends to all discovery requested by Claimants, as will be noted in subsequent orders on the many discovery motions pending in this case.  In this and later rulings, when the Court uses the term "the subject tire and similar tires," it is meant to refer back to this definition.

<u>Discoverability of Reports of Tread Throw Problems</u>

The Court takes note of Claimants' argument that Goodyear included a small number of LRC tires in the testing and investigation that led to its decision to place nylon overlays on the LRE and LRD tires.  Corporate representative Richard J. Olsen so stated in his June 15, 2006 deposition [Doc. 124, Ex. D, at 84].

The fact that a few LRC tires were included in these investigations does not justify the wholesale disclosure of multiple types of information "among and across Goodyear tire lines."  [Doc. 124, at 9].  However, the Court finds that the fact that Goodyear included LRC tires in these studies – even if only to a small extent – does render these studies relevant to issues of alleged design or manufacturing defects in the subject tire, and to that extent the Court denies Goodyear's request for a protective order.

In addition, Claimants allege that Goodyear knew that nylon overlays were useful in preventing tread separation and were feasible for use in the subject tire; these studies are therefore relevant to the question of liability for punitive damages. <u>Smith v. Ingersoll-Rand Co.</u>, *supra*, at 1250 (upholding admission of "other acts" evidence to show that defendant persevered in its refusal to place a safety device on its product despite numerous accidents, even if such evidence would not be admissible to show defect or notice, since the other products were not sufficiently similar).

This ruling will affect both this motion and other discovery motions and will be applied more specifically to the precise issues and discovery requests raised in those motions.

<u>Discovery Requests Relating to Service Life Information</u>

Goodyear also objects to Claimants' deposition notice to the extent it seeks information on topics dealing with "tire service life."  Goodyear argues that the tire at issue in this case was less than five years old at the time of the accident, and there is no evidence that it was beyond its safe service life and no scientific basis for concluding that the age of the tire had anything to do with the accident. In addition, Claimants' expert, D.R. Osborne, states that the basis for liability in this case was a design defect; he does not state that the subject tire was beyond its appropriate service life.  Indeed, he offers no opinion in that area.  Therefore, Goodyear contends, information regarding "service life" is irrelevant in this case.

The Court agrees.  It specifically rejects Claimants' attempt to equate a warranty period with a product's service life.  Manufactured products of all kinds are typically used for many years beyond their warranty period.  The motion for protective order is granted with respect to Claimants' request for information related to "service life" issues.

<u>Trade Secret Issues</u>

Goodyear's request for a protective order with respect to corporate representative depositions is also based on its concern that Claimants may be seeking information about Goodyear's rubber compound formulas, which is subject to a trade secret privilege. Goodyear states:

> While it is not entirely clear from the wording of the topics in Plaintiffs' Notice, it is possible that Plaintiffs may be seeking information pertaining to Goodyear's trade secret rubber formulas and/or properties. Goodyear's rubber compound formulas are protected from discovery by the trade secret privilege. <u>See</u> NMRA 11-508. If Plaintiffs are not seeking such information, then the Court need not consider this section of Goodyear's memorandum, but Goodyear discusses this issue below to ensure that its trade secrets are not compromised.

[Doc. 106, at 16-17].

Claimants did not address the trade secret issue at all in their Response. The Court therefore concludes that Claimants do not intend to seek any information as to Goodyear's rubber compound formulas. The issue is apparently moot, but in the interests of clarity the Court grants Goodyear's motion for protective order to the extent it seeks to protect its rubber formulas or other trade secret information from discovery by Claimants.

<u>Conclusion</u>

This motion was filed on June 9, 2006 and was not fully briefed until July 24, 2006. The depositions at issue went ahead in the meantime, with four corporate representatives being deposed between June 14-16, 2006 in Akron, Ohio. Goodyear served its objections, along with a Notice of Partial Non-Appearance, at the time it filed this Motion for Protective Order. The Court assumes that the depositions proceeded in accord with Goodyear's Notice of Partial Non-Appearance, and that the topics to which Goodyear interposes objections were not discussed, at least not for the most part,

and that this Order therefore still has some practical significance in this case.

To the extent that matters were discussed at the depositions beyond what the Court is allowing here, any such discussions will not set a precedent for the scope of discovery in this case. For purposes of the Court's later rulings on the many discovery motions still pending, at this point this Order constitutes the law of the case.

Because the Court is granting, in substantial part, Goodyear's Motion for Protective Order, there may be no need for re-deposition of Goodyear corporate representatives.[3] To the extent the Court has denied the request for protective order with reference to the "Tread-Throw Team" and the "Crown Integrity Team" studies discussed above, the Court notes that corporate representatives already deposed discussed those studies in some detail, as evidenced by the deposition extracts submitted by Claimants. Further discovery related to these studies should be produced in connection with Claimants' written discovery requests, as will be set forth in the Court's upcoming orders on Claimants' other discovery motions. There is no need to reconvene depositions of corporate representatives solely for the purpose of accommodating discovery of the team study information.

Protective Order

The Court grants Goodyear's Motion for Protective Order in substantial part.

As to the specific topics noticed in Claimants' 30(b)(6) Notice, the Court rules that the following are appropriate topics for corporate representative depositions:

---

[3]The Court is aware of Plaintiff-Intervenors' Motion for Leave to Conduct a Second Rule 30(b)(6) Deposition of Goodyear Corporate Representative [Doc. 142], but notes that that request is based on alleged newly-discovered information which Claimants state they need to explore in further depositions. That request is separate from the present controversy, and resolution of this Motion does not necessarily put to rest the issues raised in the more recent motion.

a.  This topic is limited to the subject tire and all similar tires, as defined above.

b, c, d. and e.  These topics are appropriate, but Goodyear's rubber compound formulas are protected.

f.  This topic is appropriate.

g.  This topic is not appropriate, as the tire at issue in this case was not manufactured as original equipment.

h, i, j, k, l.  These topics are limited to the subject tire and all similar tires, as defined above.

m.  This topic is appropriate.

n.  This topic is limited to similar tires, as defined above, with the exception that Claimants are entitled to discovery related to the Tread Throw Team and Crown Integrity Team studies.

o.  This topic is limited to the subject tires and all similar tires, as defined above.

p.  This topic is appropriate, but any trade secrets are protected.

q.  This topic is limited to quality control procedures for the subject tire and all similar tires, as defined above, and the subject plant.

r.  This topic is appropriate.

s.  This topic is limited to adjustment statistics for the subject tire and all similar tires.

t.  This topic is appropriate.

u.  This topic is appropriate.

v, w, x, y, z.  These topics are inappropriate.

aa.  This topic is inappropriate, except as it relates to temperature and climate conditions.

bb, cc.  These topics are inappropriate.

dd.  This topic is appropriate, but Goodyear's rubber compound formulas are protected.

ee.  This topic is appropriate.

ff.  This topic is limited to Load Range C light truck tires.

gg.  This topic is appropriate.

hh.  This topic is inappropriate.

ii.  This topic is appropriate, to the extent it relates to topics (a) through (hh) above for which discovery has been allowed.

iii.  This topic is appropriate.

## Order

IT IS THEREFORE ORDERED that the Motion for Protective Order of Defendant The Goodyear Tire & Rubber Company Concerning Amended Notice to Take 30(b)(6) Deposition [Doc. 105] is granted in substantial part, as detailed above.

IT IS FURTHER ORDERED that, if necessary to comply with this Order, Goodyear is directed to designate corporate representative(s) with knowledge of the areas allowed in this Order, and Plaintiffs may schedule the depositions of these representatives.  If Goodyear designates some or all of the same representatives whom Plaintiffs have already deposed, they may be re-deposed subject to the limitations noted in this Order.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge